UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO.: 5:03-CV-181-R

HAROLD BROOKS LEASURE,                                          PLAINTIFF

v.

AA ADVANTAGE FORWARDERS, et. al.,                              DEFENDANTS

## MEMORANDUM OPINION

This matter comes before the Court on the Defendants' Motion for Summary Judgment (Docket #127). The Plaintiff, Harold Brooks Leasure ("Leasure") has responded to that motion (Docket #177) and the Defendants have replied to that response (Docket #184). This matter is now ripe for adjudication. For the following reasons, the Defendants' Motion for Summary Judgment is **GRANTED**. Accordingly, all claims against the Defendants are **DISMISSED**.

## PROCEDURAL HISTORY

On August 11, 1999, Defendant Coleman American Companies, Inc. ("Coleman") filed a complaint against Leasure in the Circuit Court of Christian County, Kentucky alleging: breach of contract, breach of implied covenants of good faith and fair dealing, fraud, and fraudulent concealment, all relating to the purchase of Leasure's businesses. On May 5, 2000, the state court granted partial summary judgment in favor of Coleman on its breach of contract claim, awarding Coleman $691,913.88.[1]

During the course of the state court proceedings, Leasure filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Western District of Kentucky, on July 31, 2000. Coleman, as a creditor of Leasure, filed several motions with the bankruptcy court,

---

[1] The state court amended its order in March 2001, holding that the award of damages be treated as a set-off against the purchase price that Coleman was to pay under the contract.

including: 1) a motion for relief from stay to allow the state court proceeding in state court to go forward; 2) a motion to appoint a trustee pursuant to 11 U.S.C. § 1104; 3) a Motion to Dismiss pursuant to 11 U.S.C. § 1112; and 4) a motion to convert the case from Chapter 11 to Chapter 7.

Following three (3) days of testimony, the Bankruptcy Court, the Honorable J. Wendell Roberts, issued findings of fact and conclusions of law, pursuant to Bankruptcy Rule 7052, which included: 1) Leasure had received payment on $245,950.00 worth of accounts receivable ("AR"), and did not inform Coleman and/or pass the money to Coleman prior to the execution of the contract; 2) Leasure had inflated the value of AR in an amount of $43,937.72, by including duplicate listings; 3) Leasure had inflated the value of AR in an amount of $83,876.14; 4) in certifying the value of his accounts payable ("AP"), Leasure failed to mention a promissory note payable to First United Bank in the amount of $59,000.00; 5) in certifying the value of its AP, Leasure failed to disclose that one of his corporations had signed a guarantee of Leasure's personal debt in the amount of $1,075,000.00; and 6) the Court found that Leasure's conduct amounted to bad faith in regards to his business affairs and his preparation and filing of his bankruptcy petition.

On August 11, 2003, Leasure filed a complaint against Coleman and ten (10) other business entities and six (6) persons in this Court, alleging violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO").  Leasure alleged that the Defendants represent a RICO enterprise that defrauded the Plaintiff out of his businesses in order to add them to their RICO enterprise.  Leasure further alleged that the Defendants perpetrated these acts in concert, through mail and wire fraud.  The Plaintiff also contended that the Defendants failed to timely pay Leasure for services rendered under a Department of Defense Personal Property

Program.

On October 15, 2004, the Kentucky Court of Appeals affirmed in part and reversed in part the state court's order granting partial summary judgment. The Court of Appeals remanded the case for a jury trial for issues related to proof of the amount of damages sustained by Coleman. In February 2006, the state court trial took place in the circuit court of Christian County, Kentucky. The jury returned a verdict in favor of Coleman against Leasure for breach of contract and fraud, awarding Coleman $418,065.72 in damages. Leasure has since appealed this decision to the Kentucky Court of Appeals.

## BACKGROUND

The facts below have been amended from the Court's previous memorandum opinion (Docket #78) addressing the Defendants' Motion to Dismiss.

Leasure filed this action against Defendants for violations of the RICO, 18 U.S.C. §§ 1961-68, alleging that the Defendants have defrauded him, the United States Government, and other entities, which have done business with the Defendants. Leasure alleges that Defendants are a variety of companies joined together to form an illegal RICO enterprise. The Defendants are engaged in the moving and storage business and are receiving United States Government contracts under the Department of Defense Personal Property Program ("DOD PPP") to move personal property and household goods for military service members.

Leasure alleges three (3) sets of facts comprising the Defendants' fraud against him, the United States Government, and other companies.

First, Leasure alleges that he agreed to sell his company's stock to Defendant Coleman. Leasure's company was a moving and storage business that served Fort Campbell, Kentucky,

3

through the DOD PPP.  Leasure claims that he had done business with some of the Defendants before he sold the businesses.  Leasure claims after that Coleman took control of the businesses, it refused to pay him consideration for the business, and it also refused to pay liabilities owed by Leasure.  Further, Leasure alleges that Coleman had no intention of paying the consideration or liabilities owed to him.

Additionally, Leasure contends that the Defendants allegedly owed his company money from prior business dealings, in which the Defendants allegedly refused to pay, destroying the cash flow of Leasure's business.  Payments made to Leasure's business were allegedly diverted and credited to the Defendants' other businesses.  After Defendants took control of Leasure's business, Leasure claims they destroyed the business' financial records and created false ones.  Then, Leasure submits that the Defendants sued Leasure in state court for breach of contract and fraud based on the false records.  Leasure claims he did not know about the Defendants' preparation of the fraudulent records until after the lawsuit commenced.  Leasure claims that the false records were presented to the state court and the state court granted the Defendants a substantial judgment, currently on appeal.  Leasure also alleges that because Coleman did not pay Leasure's business liabilities, Leasure may lose personal assets that he pledged as security.

Second, Leasure claims that his former businesses are being used in a larger scheme to defraud the United States Government.  The scheme consists of Defendants making false statements to the Government about their financial records.  Further, the Defendants allegedly also improperly colluded amongst themselves in bidding on government contracts.  As a general rule, none of the bidding businesses are supposed to know what any other businesses bid or to be under common financial and administrative control.  By being associated with each other, the

4

businesses are able to get paid higher rates and obtain a disproportionate share of the moving and storage work for the Government.

Finally, Leasure alleges that Defendants earned illegal profits by "playing the float." Essentially, the Government paid Defendants money to give to third-parties but Defendants either improperly held the money for a period of time or refused to pay the third-parties until the third-party took legal action.  Defendants allegedly made a profit on the money that should have been paid to the third-parties.

Leasure alleges that the Defendants used the mail, telephones, and electronic communications to defraud the Government, third-parties, and him.  As a result, Leasure claims that the Defendants have violated RICO, and therefore, he is entitled to recover against them.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case."  *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996).  The plaintiff must present more than a mere

5

scintilla of the evidence.  To support his position, he must present evidence on which the trier of

fact could find for the plaintiff.  *See id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52

(1986)).

Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere

existence of a colorable factual dispute will not defeat a properly supported motion for summary

judgment.  A genuine dispute between the parties on an issue of material fact must exist to

render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.,* 90 F. 3d

1173, 1177 (6th Cir. 1996).  Finally, while Kentucky state law is applicable to this case pursuant

to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the

standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in

*Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, Ky., 807 S.W.2d 476 (1991)." *Gafford v. General

Electric Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

The Defendants filed this motion for summary judgment on July 3, 2006, contending that

they are entitled to judgment as a matter of law on Leasure's claims that the Defendants violated

RICO, because: 1) Leasure cannot prove that the Defendants proximately caused his alleged

injuries; 2) Leasure cannot assert RICO claims and/or recover due to injuries incurred by third

parties; 3) Leasure's claims that he was damaged as a result of "playing the float" are time-

barred; 4) Leasure's claims are precluded by the doctrines of *res judicata* and collateral estoppel;

5) Leasure cannot introduce evidence on certain claims alleged due to his prior judicial

admissions; and 6) Leasure cannot prove a pattern of racketeering activities.

In his response to the Defendants' motion for summary judgment, the Plaintiff asserts: 1)

6

there are triable issues of fact regarding proximate cause that preclude summary judgment; 2) there is no basis to grant summary judgment on a lack of standing or expiration of the statute of limitations; 3) the state court findings, bankruptcy court findings, and prior judicial admissions do not support a granting of summary judgment; and 4) there are triable issues of fact regarding an existence of a pattern of racketeering activity that preclude summary judgment.

In their reply, the Defendants reemphasize the arguments made in their motion for summary judgment, and contest the Plaintiff's arguments submitted in his response.

The Court shall address each of the Defendants' six (6) assertions and the Plaintiff's counter-arguments to these assertions.

### 1. Proximate Cause under RICO

RICO, 18 U.S.C. § 1964(c) states:

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

The Sixth Circuit Court of Appeals interprets "RICO's civil-suit provision [as] impos[ing] two distinct but overlapping limitations on claimants--standing and proximate cause." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612 (6th Cir. 2004).  "From a substantive standpoint, a RICO plaintiff who can show a direct injury may still lose the case if the injury does not satisfy other traditional requirements of proximate cause--that the wrongful conduct be a substantial and foreseeable cause and that the connection be logical and not speculative." *Trollinger* at 615.

7

To establish standing under RICO "a plaintiff must plead and prove an actual injury to its business or property 'by reason of' a defendant's section 1962 transgression." *Pik-Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 889 (6th Cir. 2000).  A plaintiff does not have standing to bring a RICO claim if the plaintiff suffers "derivative or passed-on injuries." *Trollinger*, 370 F.3d at 614 (citing *County of Oakland v. City of Detroit*, 866 F.2d 839, 851 (6th Cir.1989)).[2]

Even if a plaintiff can prove that he/she has standing to bring a RICO claim, a plaintiff must also show that his/her injuries were proximately caused by a defendant's RICO violation. *Id.*  In *Trollinger*, the Court held that "while a RICO plaintiff and defendant may have a direct and not a derivative relationship, the causal link between the injury and the conduct may still be too weak to constitute proximate cause--because it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes." *Id.* at 614 (citing *Perry v. American Tobacco Co., Inc.*, 324 F.3d 845, 850 (6th Cir. 2003)).  In *Pik-Coal Co.*, the Court, in quoting the United States Supreme Court case of *Holmes v. Securities Investors Protection Corp.*, explained the concept of proximate cause under RICO, stating:

> [A]mong the many shapes this concept [proximate causation] took at common law was a demand for some direct relation between the injury asserted and the injurious conduct alleged. Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover.
> ...First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.  Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general

---

[2]The Court in *Trollinger* noted that "[f]rom a procedural standpoint, a RICO case with a derivative-injury problem is better suited to dismissal on the pleadings than a RICO case with a traditional proximate-cause problem (e.g., a weak or insubstantial causal link, a lack of foreseeability, or a speculative or illogical theory of damages)."

> interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Pik-Coal Co.* at 889 (quoting *Holmes v. Securities Investors Protection Corp.*, 503 U.S. 258, 268-70 (1992)).  As such, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 126 S .Ct.1991, 1998 (2006).[3]

In *Pik-Coal Co.*, the Court examined whether the injuries sustained by the plaintiff were proximately caused by the alleged RICO violations of the defendants. *Pik-Coal Co.* at 888-89. *Pik-Coal Co.* involved allegations that the defendants' conspiratorial acts dispossessed the plaintiff of contractual coal brokerage commissions. *Id.* at 885-86.  Specifically, the plaintiff alleged "a RICO conspiracy against all defendants by which they deprived the plaintiff of sales commissions which it would have earned under its November 8, 1979 agreement with Solar[, a defendant in this matter,] if Big Rivers[, a defendant in this matter,] had awarded Contract 589 to Alley-Cassetty instead of E & M[, a defendant in this matter]." *Id.* at 887.

In applying *Holmes*, the Court in *Pik-Coal Co.* determined that the RICO claims alleged by the plaintiff "were not, and could not be, supported by sufficiently proximate injuries." *Id.* at 890.  The Court reasoned that "[a]t most, Pik has alleged, and could only allege, that the defendants' conspiratorial acts directly and proximately injured Big Rivers because the corruption of that defendant's agents and alleged co-conspirators caused it to award Contract 589

---

[3] *See also Saro v. Brown*, 11 Fed. Appx. 387, 389 (6th Cir. 2001) (noting that even when a court assumes, arguendo, that the plaintiff has suffered a compensable injury under RICO, the plaintiff must still show proximate cause...this means showing some injury that flows from one or more of the predicate acts of the defendant)("If no injury flowed from a particular predicate act, no recovery lies for the commission of that act.").

to an averredly [sic] economically unstable enterprise, namely defendant E & M; which in turn harmed Alley-Cassetty financially by forestalling Big Rivers from granting it Contract 589 irrespective of its initially attractive proposal." *Id.* The Court determined that "at most" Pik-Coal Co. was merely "indirectly divested" by the alleged conduct of the defendants because it had never executed a written contract with the parties, and its alleged losses were caused by a defendant's failure to purchase certain coal from another company not belonging to the plaintiff, but nothing that directly affected the plaintiff. *Id.* (holding "Pik's alleged economic injuries were indirect and remote byproducts of Big Rivers' election to contract its coal supply from E & M to the exclusion of Alley-Cassetty."). Ultimately, the Court held that the plaintiff had no RICO claims against the defendant because the plaintiff could not prove that its alleged injuries were proximately caused by the defendants' actions. *Id.*

In the instant matter, the Defendants contend that the Plaintiff cannot show proximate causation between his alleged injuries and the alleged RICO violations by the Defendants. The Defendants argue that Leasure was not directly damaged by the alleged conduct of Coleman (and assumes arguendo that if anyone was injured it was the United States Government, not Leasure); and that Leasure has merely stated that the Defendants have "increased their market share at a competitor's expense." *Anza*, 126 S. Ct. at 1998.

The Plaintiff asserts that he was a direct target of the wrongful conduct of a RICO enterprise, and as such, was directly injured by the Defendants' actions when Coleman developed a scheme in 1998 to defraud the Plaintiff by acquiring his business by fraud. In particular, the Plaintiff alleges that Coleman knew of the Plaintiff's shortcomings and improprieties in regards to Leasure's AR and AP disclosures before the purchase of Leasure's

10

company in June 1999, yet Coleman went ahead and purchased Leasure's company.  After allegedly discovering these errors in the Plaintiff's books, but before the purchase of the company, the Plaintiff claims that Coleman did not disclose this information to the Plaintiff because Coleman wanted to minimize its short term financial risk by 1) not paying off debts and loans as Coleman agreed to do so prior to the closing and 2) suing Leasure in state court.[4]  The Plaintiff supports this argument by noting that Coleman "rushed" to file a claim in state court rather than trying to work out any problems, which he argues supports the idea that the Defendant sought to defraud the Plaintiff from his businesses because it allegedly shows that the Defendants had been planning to sue Leasure all along.  In addition, the Plaintiff alleges that because Coleman supported its motion for summary judgment in the state court proceedings with detailed charts that covered the financial inaccuracies of the Plaintiff, it demonstrates Coleman had planned all along to sue Leasure in state court.   Ultimately, the Plaintiff contends that the Defendants "gained a net asset value of more than $500,000.00," leaving the Plaintiff without his businesses and on the verge of losing real estate.

"When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza* at 1998.  In reviewing the evidence from the depositions to the prior state court proceedings and accompanying financial documents, the Court finds that the Plaintiff cannot prove that his

---

[4]The Plaintiff has cited numerous legal conclusions from a report written by his retained expert, Mr. Norman Transeth, a retired Special Agent with the Federal Bureau of Investigation who used to investigate RICO cases.  The opinions offered by Mr. Transeth are improper legal conclusions, and therefore, they are inadmissible and shall not be considered by the Court in reaching its decision in this matter. *See* Federal Rule of Evidence 704(a); *Stoler v. Penn Cent. Transp. Co.*, 583 F.2d 896, 899 (6th Cir.1978); *Berry v. City of Detroit*, 25 F.3d 1342, 1354-55 (6th Cir. 1994); *Harrah's Entertainment, Inc. v. Ace American Ins. Co.*, 100 Fed.Appx. 387, 393 (6th Cir. 2004); *DeMerrell v. City of Cheboygan*, 2006 WL 3090133, *7 (6th Cir. 2006).

alleged injuries were proximately caused by the alleged RICO violations of the Defendants because the Plaintiff has not demonstrated that genuine issues of material fact exist as to the issue of proximate cause.  Under RICO, a causal link between the alleged injuries of the Plaintiff and the alleged actions by the Defendants cannot be "speculative" or "illogical." *Perry* at 850; *Trollinger* at 614.  Here, while the Plaintiff may claim that he has sustained injuries based on his interpretation of the events leading up to and subsequent to the purchase of his companies in June 1999, RICO mandates that a plaintiff must "plead and prove an actual injury to its business or property." *Pik-Coal Co.* at 889.  In looking at the depositions and state court proceeding testimonies of Leasure, Mr. James Coleman ("Mr. Coleman") (owner of Coleman), and Mr. Richard Cundith ("Mr. Cundith") (Coleman's in-house accountant), the Court finds that the Plaintiff has not presented enough evidence to support his theory so that the trier of fact could find for him. *See Hartsel*, 87 F.3d at 799.

In looking at the trial testimony, prior to the purchase, the record indicates that Leasure first learned that there were problems with his AR in March or April 1999, about two (2) months prior to the purchase of his company by Coleman.  The Plaintiff stated that he had first learned about these problems from a financial consulting firm, Akersloot, DePriest & Wall ("Akersloot"), he had hired to review the deal between Coleman and him.  However, the Plaintiff never informed Coleman about these problems prior to the purchase in June 1999.  In his testimony, Leasure stated that he believed the problems had been "straightened out or corrected" when he gave the final Akersloot report to Coleman.

In April 1999, Mr. Coleman and Mr. Cundith visited Leasure's facilities in Hopkinsville, Kentucky, and they reviewed some of the AR files and other financial records.  Mr. Coleman

12

stated that he saw nothing in the AR files he examined prior to closing that would indicate any problems.  In addition, Mr. Cundith testified that he reviewed the "cash-in-bank issue" as well as the bank reconciliations, accounts payable, financial statements and accounts receivable prior to the purchase by Coleman.  While Mr. Cundith stated it troubled him that Leasure had no formal set of financials records, and that he communicated this concern to Mr. Coleman, he also said that he never saw anything in the materials that he reviewed that would cause him to tell Mr. Coleman not to go through with the deal.

Lastly, Leasure stated that before the purchase neither party formerly audited the financial records of his businesses.  Instead, Leasure gave Mr. Coleman a "100%" guarantee in the contract that the disclosures concerning the accounts receivable were truthful.  Leasure testified that he "was confident enough in the number that I said I would guarantee the receivables 100 percent."  He also admitted at the trial that he understood Mr. Coleman relied upon his guarantee when purchasing Leasure's companies.

The record prior to the purchase in June 1999 does not indicate a scheme concocted by the Defendants to defraud the Plaintiff out of his business.  While the evidence may indicate that Coleman was aware that the financial records of Leasure were not 100% accurate prior to the purchase, nothing in the record indicates the Mr. Coleman or Mr. Cundith knew, prior to the purchase, that the AR and AP were off by the numbers eventually determined by the state court.  If anything, the record indicates, as the state court found, that Leasure was not completely forthcoming with Coleman about his financial statements prior to the purchase.  These facts do not suggest a RICO scheme on the part of the Defendants, nor do these facts demonstrate that the Defendants proximately caused the alleged injury to Leasure.

13

In examining the record after the purchase, Coleman discovered within two (2) months after the purchase that the financial disclosures of the Plaintiff were not even close to being 100% accurate.  Coleman discovered that a large amount of the AR had been paid prior to the closing and that there were duplicate accounts that had been paid in part.  Mr. Coleman testified that close to two-thirds of the AR were uncollectible.  In addition, Coleman discovered that during the negotiations for the purchase of Leasure's companies, Leasure had obligated his companies in the form of a guarantee on a $1,000,000.00 loan made personally to the Plaintiff and his wife; however, he did not inform Coleman of this prior to the purchase.  Subsequent to these findings, Coleman began to correspond with and notify Leasure about these transgressions; however, no resolution between the parties took place.  The evidence indicates that by July 1999, all of these problems had been discovered by Coleman.  The initial state court suit against Coleman was filed on August 11, 1999, a little more than two (2) months after the purchase.

Similar to the record prior to the purchase, the evidence subsequent to the purchase in June 1999 does not support the Plaintiff's argument that the Defendants furthered a scheme to defraud the Plaintiff out of his business.  The evidence indicates, which the state court record reflects, that Coleman discovered numerous problems with the financial records concerning Leasure's businesses that were not disclosed to Coleman by Leasure prior to the purchase.  However, the evidence does not suggest that Coleman sought to defraud Leasure from his businesses.

The claim by the Plaintiff that the Defendants "rushed to court" rather than settling the dispute does not imply that the Defendants' wished to defraud Leasure, as that claim is not only without merit, but nothing in the record supports that conclusion.  The Plaintiff has provided no

14

evidence to even demonstrate the truthfulness of that theory, but instead offers mere speculation. On the contrary, the record indicates that the Defendants spent the first two (2) months after the purchase of Leasure's companies searching through a paper trail that Leasure recognizes, and the state court found, to be substantially inaccurate.  In addition, the fact that Coleman provided detailed charts with its motion for summary judgment in November 1999 that specified the inaccuracies of the Plaintiff's disclosures does not in anyway support the notion that the Defendants had developed a scheme to sue the Plaintiff in state court.  Once again, the Plaintiff has provided no evidence to even support the truthfulness of that theory, but instead offers mere speculation.

The Court recognizes that on a motion for summary judgment the facts must be examined in a light most favorable to the nonmoving party, which in this case is the Plaintiff. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  However, "not every issue of fact or conflicting inference presents a genuine issue of material fact."  *Street*, 886 F.2d at 1477.  While the determination of proximate causation requires the Court to conduct both factual and legal inquiries, the Plaintiff must present more than a mere scintilla of the evidence to support his position.  Here, the evidence shows that Leasure has not presented evidence on which the trier of fact could find for the Plaintiff.  *Anderson*, 477 U.S. at 251-52.  Accordingly, the Court finds that Leasure cannot prove that the Defendants proximately caused his alleged injuries as his theories of causation are not supported by the evidence.

### 2. Assertion of RICO Claims and/or Recovery on Behalf of Third Parties

As discussed *supra*, the Sixth Circuit Court of Appeals, in *Pik-Coal Co.*, held that a RICO plaintiff must allege a direct injury from the alleged actions of a defendant and cannot

recover under RICO for indirect injuries that stem from damages sustained by a third party. *Pik-Coal Co.*, 200 F.3d at 887-90; *see also Trollinger*, 370 F.3d at 614 (citing *Perry*, 324 F.3d at 849 (holding that "policy holders lacked standing under RICO to sue tobacco companies for increased costs of insurance passed on to them as a result of the increased costs of treating smoking-related illnesses.").

Recently, the United States Supreme Court, in *Anza*, addressed this issue in great detail, emphasizing that under RICO's proximate cause analysis set out in *Holmes*, a RICO plaintiff may not recover for damages sustained by a third party, noting that "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." *Anza*, 126 S. Ct. at 1996-98 (citing *Holmes*, 503 U.S. at 268-70 (proximate cause under RICO requires "some direct relation between the injury asserted and the injurious conduct alleged.")).

In *Anza*, the plaintiff sued Anza under RICO alleging that it suffered injuries because Anza failed to charge New York State's sales tax to "cash-paying customers, allowing it to reduce its prices without affecting its profit margin; and that it submitted fraudulent state tax returns to conceal the conduct, which involved committing mail and wire fraud, both forms of 'racketeering activity' under RICO." *Anza* at 1992. The plaintiff alleged that the racketeering scheme unlawfully profited Anza at the expense of the plaintiff because Anza gained sales and a market share through its activities. *Id.* at 1994. In addition, the plaintiff alleged that Anza submitted fraudulent tax returns in an effort to conceal its illegal conduct. *Id.*

The Court reversed the decision by the Second Circuit Court of Appeals, holding that because the State of New York, and not the plaintiff, was the direct victim of the alleged RICO

16

violation, its claim for indirect injuries was "too attenuated" to satisfy the directness requirement set out in *Holmes*. *Id.* at 1996-98.  The Court stated that "[a] RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market share at a competitor's expense." *Id.* at 1998.  The Court reasoned that if the allegations against Anza were true, then the State of New York, not the plaintiff, would pursue the appropriate remedies under RICO as the injured party. *Id.*

In his complaint, Leasure alleges that his former businesses are being used in a scheme by the Defendants to defraud the United States Government, and therefore, seeks to recover under RICO.  In his response to the Defendants' motion, Leasure admits that the United States Government is the "principal victim" of the Defendants' RICO enterprise.  In his deposition, Leasure states that he was not "personally" harmed by the Defendants' alleged conduct against the United States Government.  The Court finds that at most, Leasure has an "attenuated connection," if any, between his alleged injuries and the alleged conduct of the Defendants. *Anza* at 1997.  Therefore, Leasure may not recover for his claims based on the alleged injuries sustained by the United States Government.

Similar to *Pik-Coal Co.*, *Perry* and *Anza*, the Plaintiff cannot recover under RICO for any harms he may have indirectly sustained as a result of the alleged direct injuries incurred by the United States Government.  Aside from admitting that he was not harmed by the Defendants' alleged conduct against the United States Government, Leasure has not provided any evidence and/or explained how he was injured by the Defendants' alleged conduct against the United States Government.  Even assuming that the Defendants' did harm the United States Government, the Government, not Leasure, would be the appropriate party to bring suit under

17

RICO against the Defendants. *See Anza* at 1998.  Accordingly, Leasure may not recover under RICO based on the alleged injuries sustained by the United States Government.

### 3. The Timeliness of the "Playing the Float" Claims Asserted by the Plaintiff[5]

Leasure alleges that the Government paid Defendants money to give to third-parties, but the Defendants either improperly held the money for a period of time or refused to pay the third-parties until the third-party took legal action.  Defendants allegedly made a profit on the money that should have been paid to the third-parties.  This process is known as "playing the float."

As discussed *supra*, Leasure cannot recover for any injury sustained by the United States Government. *See Anza* 1996-98.  In addition, any claim by Leasure against the Defendants for playing the float against him personally is time-barred by RICO's four (4) year statute of limitations. *See Rotella v. Wood*, 528 U.S. 549, 553-55 (2000); *Bygrave v. Van Reken*, 238 F.3d 419 (Table), *3 (6th Cir. 2000)(noting that a plaintiff need not discover both the RICO "injury" and the "pattern of racketeering activity" (i.e., the existence of two or more predicate acts) in order to trigger the four-year statute of limitations); *Taylor Group v. ANR Storage Co.*, 24 Fed. Appx. 319, 325 (6th Cir. 2001).

"The four-year period begins to run when a party knew, or through exercise of reasonable diligence should have discovered, that the party was injured by a RICO violation." *Sims v. Ohio Cas. Ins. Co.*, 151 Fed. Appx. 433, 435 (6th Cir. 2005).  "A plaintiff need only be aware of 'storm warnings' but does not need to 'hear[ ] thunder and see [ ] lightening.'" *Id.* at 436 (citing

---

[5]In his response, the Plaintiff states that he "does not intend to seek damages at trial for any damages at trial for any harm he may have suffered, or for any harm suffered by the third party vendors and contractors, because of the enterprise's illegal actions in playing the float."  The Plaintiff states that purpose behind introducing such evidence is not prove damages, but is instead to prove the existence and operation of the Defendants' RICO enterprise.  Nonetheless, the Plaintiff's complaint asserts a claim or recovery based on this theory, and the Court shall address the merits of this claim.

*Isaak v. Trumbull Sav. & Loan Co.*, 169 F.3d 390, 399 (6th Cir.1999)).

In his deposition, Leasure stated that the receivables that should have been paid by Coleman were not paid prior to June 1 on a "timely basis," and therefore, "[w]e were harmed by the fact we did not have the cash to use during March, April, May period of time" based on $100,000 that Coleman owed Leasure.  Following the purchase by Coleman of Leasure's business, and upon its discovery that the Plaintiff's AR were inaccurate, and assuming that Coleman was intentionally withholding its payment of money owed to Leasure as alleged, the Plaintiff should have discovered Coleman's alleged misdeeds because Leasure knew that Coleman owed him money before June 1, 1999, yet Coleman did not get him the money at the time of the purchase.  Following the purchase, Coleman began a written correspondence with Leasure regarding inaccuracies of the AR.  Based on these facts and assuming that the Defendants were "playing the float" at that time, Leasure should have seen the "storm warnings" before Coleman filed his suit against him in state court on August 11, 1999.  As noted *supra*, the Plaintiff filed this suit against the Defendants on August 11, 2003.  Accordingly, the "playing the float" claim asserted by the Plaintiff against the Defendants is not only time-barred by the four-year statute of limitations, but is also precluded because the Plaintiff cannot recover under RICO for injuries sustained by third parties.

### 4. The Applicability of the Doctrines of *Res Judicata* and Collateral Estoppel

The Sixth Circuit Court of Appeals, in *Rawe v. Liberty Mut. Fire Ins. Co.*, explained the definitions of the doctrines of *res judicata* and collateral estoppel, noting:

> Res judicata is often analyzed further to consist of two preclusion concepts: "issue preclusion" and "claim preclusion." Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided.... This effect also is referred to as direct or collateral estoppel. Claim preclusion refers

19

> to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit. Claim preclusion therefore encompasses the law of merger and bar.

*Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521, 528 (6th Cir. 2006)(quoting *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)). The Defendants assert that these two (2) doctrines preclude the RICO claims asserted by the Plaintiff. However, the Plaintiff argues that these arguments are actually "unclean hands" and/or "innocent party" defenses; that the Plaintiff was not required to bring his RICO claim as a counterclaim in state court; and these defenses are inapplicable to defend against RICO claims.

Lastly, the Defendants contend that Leasure is barred from re-litigating issues that were addressed by the United States Bankruptcy Court for the Western District of Kentucky, arguing that *res judicata* precludes Leasure from asserting any related claims. In response, Leasure once again asserts that the Defendants are barred from making such an argument because it is actually an "unclean hands" defense, not the defense of *res judicata*, and that a bankruptcy court ruling is not preclusive for *res judicata* purposes.

The Court shall address the applicability of each of the *res judicata* doctrines, A) issue preclusion and B) claim preclusion, to the decisions reached by the Christian County Circuit Court. In addition, the Court shall also address C) the Plaintiff's argument concerning the doctrine of unclean hands as to those claims.[6] Lastly, the Court shall address D) whether the

---

[6]The Court notes that the Plaintiff also asserts that the state court decision should not have a preclusive effect on this Court because the Plaintiff has appealed that decision. However, contrary to the Plaintiff's argument, this Court does not take notice of whether or not a state court decision has been appealed for preclusion purposes, but look to whether the state court has reached a final decision on the merits. *See Stemler v. City of Florence*, 126 F.3d 856, 871 (6th Cir. 1997)(holding "the pendency of an appeal does not destroy the finality of the judgment for the purposes of issue preclusion under Kentucky law."); *see also Roberts v. Wilcox*, 805 S.W.2d 152, 153 (Ky. Ct. App. 1991)(stating "the long-standing federal rule holds that the pendency of an appeal has no effect whatsoever on the finality of a judgment for purposes of collateral estoppel. *Hunt v. Liberty Lobby, Inc.*, 707 F.2d 1493 (D.C.Cir.1983).").

decisions of the Bankruptcy Court have a preclusive effect upon the claims asserted by Leasure in the instant matter, and whether the Defendants' are precluded from raising this argument.

## A. Issue Preclusion (Collateral Estoppel) - Christian County Circuit Court

Collateral Estoppel "'refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided.' *Barnes v. McDowell*, 848 F.2d 725, 728 n. 5 (6th Cir.1988)." *Cockrel v. Shelby County School Dist.*, 270 F.3d 1036, 1046 (6th Cir. 2001). Federal courts must give the factual findings of a state court preclusive effect. *Id.* "Kentucky courts give preclusive effect to factual findings in a previous proceeding 'only as to matters which were necessarily involved and determined in the former action,' as opposed 'to matters which were immaterial or unessential to the determination of the prior action or which were not necessary to uphold the judgment.'" *Id.* (quoting *Barnes* at 730-31). This doctrine precludes an issue when three (3) elements are met: (1) the issue in the current action and the prior action are identical; (2) the issue was actually litigated; and (3) the issue was necessary and essential to the judgment on the merits. *U.S. v. Beaty*, 245 F.3d 617, 624 (6th Cir. 2001)(citing *United States v. Three Tracts of Prop. Located on Beaver Creek, Knott County, Kentucky*, 994 F.2d 287, 290 (6th Cir.1993)).

In the complaint filed by the Plaintiff, Leasure alleges that:

After Defendants took control of Leasure's business, Leasure claims they destroyed the business's financial records and created false ones. Then, Leasure submits that the Defendants sued Leasure in state court for breach of contract and fraud based on the false records. Leasure claims he did not know about the Defendants' preparation of the fraudulent records until after the lawsuit commenced. Leasure claims that the false records were presented to the state court and the state court granted the Defendants a substantial judgment, currently on appeal.

In February 2006, Coleman recovered against Leasure in state court for breach of contract and

fraud claims, with the jury awarding Coleman $418,065.72 in damages.  The Court must determine whether the verdict by the state court precludes Leasure from asserting his RICO claims against the Defendants.

In the instant matter, Leasure asserts that the Defendants falsified his financial records so that they could bring suit against him in state court.  In addition, Leasure alleges that the law suit brought in Christian Circuit Court was based entirely on these alleged falsified records.  However, the state court determined that Leasure had committed fraud by misrepresenting the value of his assets prior to the purchase of his businesses by Coleman, and the jury awarded Coleman damages based largely on those financial records.  Although RICO legal matters were not decided by the state court, the state court did determine issues directly related to the financial records, which included whether Leasure misrepresented the records.  If this Court were to permit the Plaintiff's RICO claims to go forward based on Leasure's theory concerning the financial records, the Court would more than likely run the risk of re-litigating a matter decided by the state court and/or reaching a decision on an issue counter to a state court finding.

In looking at three (3) elements set out by the Sixth Circuit in determining whether collateral estoppel precludes the re-litigation of a matter, the issue involving the misrepresentation and/or validity of the financial records was addressed by the state court.  The state court had to determine whether Leasure had misrepresented the financial records, and it held that he had done so.  This determination was dispositive in the state court finding that Leasure had committed fraud and breached his contract with Coleman.  Here, Leasure wishes to re-litigate the misrepresentation and/or validity of the financial records once again, although this time around he asserts that the Defendants falsified the records, and therefore, misrepresented

22

the records to the state court.  This attempt to re-litigate this issue in the instant matter is what the doctrine of collateral estoppel seeks to preclude. *See In re Commonwealth Institutional Securities, Inc.*, 394 F.3d 401, 405 (6th Cir. 2005).  As such, the first element of collateral estoppel supports issue preclusion because the Plaintiff is attempting to re-litigate the same issue.

The second and third elements also support precluding the Plaintiff from re-litigating the issue in the instant matter.  As noted above, this matter was litigated by the state court when it determined that Leasure had misrepresented the financial records of his companies, therefore satisfying the second element.  Lastly, the litigation of this issue in the state court was necessary and essential to the judgment on the merits because the validity of the financial records went to the fraud claims.  Accordingly, the doctrine of collateral estoppel preclude these issues from being re-litigated before this Court.

## B) Claim Preclusion - Christian County Circuit Court

"Claim preclusion is the doctrine by which a final judgment on the merits in an action precludes a party from bringing a subsequent lawsuit on the same claim or raising a new defense to defeat a prior judgment." *Mitchell v. Chapman*, 343 F.3d 811, 819 (6th Cir. 2003).  "It precludes not only relitigating a claim previously adjudicated; it also precludes litigating a claim or defense that should have been raised, but was not, in the prior suit." *Id.*  In order for the doctrine of claim preclusion to bar the re-litigation of the same claim, a party must prove: 1) a prior decision was a final decision on the merits; 2) the present action is between the same parties or their privies as those to the prior action; 3) the claim in a present action should have been litigated in the prior action; and 4) an identity exists between the prior and present actions,

or that the claim arises from the same nucleus of operative facts. *Id.* (citing *Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir.1995)); *Browning v. Levy*, 283 F.3d 761, 772 (6th Cir. 2002).

     Here, the first two (2) elements have been met as the state court reached a final decision on the merits and the present action is between the same parties, Leasure and Coleman.  In looking at the third element, determining whether the RICO claim in this matter should have been litigated in the state court action, the Court must first determine whether the claim could have been brought in state court. *Browning* at 772-73.  A party may bring a RICO claim in state court as state courts have concurrent jurisdiction with federal courts to hear RICO cases; as such Leasure could have brought the claim in the prior state court proceeding. *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).

     If the claim could have been brought in the state court, the Court must then determine if the claim in the state court proceeding "relates to" the claim in the instant matter, in that it could affect the outcome of the prior case. *Browning* at 773.  As analyzed *supra*, Leasure's present claim deals with the misrepresentation and/or validity of the financial records, which the state court addressed in the prior litigation.  A decision in this matter contrary to that decision could affect the outcome of the prior case. *Id.*  As such, the claim relates to the prior claim. *Id.*; *see also Pavlovich v. National City Bank*, 461 F.3d 832, 835 (6th Cir. 2006).  Therefore, Leasure should have brought the RICO claim in state court.

     In addressing the final element, the Court must determine if the claims asserted by Leasure "arose out of the same transaction or series of transactions, or whether the claims arose out of the same core of operative facts." *Browning* at 774.  Here, the facts of both cases concern

the purchase of Leasure's companies by Coleman, and the events that took place both before and after the purchase.  As such, there is an identity of claims between the state court proceeding and the instant matter.

Accordingly, the claims asserted by Leasure in this matter are barred by the doctrine of claim preclusion.

## C. The Defenses of "Unclean Hands" and the Counterclaim in State Court

In his response, Leasure contends that the Defendants' *res judicata* defense is actually an "unclean hands" defense, and that an unclean hands defense is not available to the Defendants. However, as demonstrated *supra*, the Defendants' defense was in fact the doctrine of *res judicata*, not the doctrine of unclean hands.  In addition, the fact that Leasure attempted to assert a counterclaim against Coleman for fraud in the state court action and that the claim was denied because Leasure filed it right before the state court trial began, has no bearing on the instant case.  As properly noted by the Defendants, Leasure had sufficient time to file a counterclaim against Coleman during the state court action, whether it related to the fraud and/or RICO claims Leasure contends were committed by Coleman.  Contrary to the Plaintiff's argument that the case law demonstrates that the Plaintiff did not have to assert his RICO claim during the state court action, the case law does in fact demonstrate that the Plaintiff should have asserted his RICO claim during the state court action. *See supra*.  Accordingly, Leasure's arguments against *res judicata* are without merit.

## D) Issues Addressed by the United States Bankruptcy Court for the Western District of Kentucky

Lastly, the Defendants contend that Leasure is barred from re-litigating the issues that

were decided by the Bankruptcy Court.  In his response, Leasure asserts that the Defendants'

defense on "unclean hands" is not available, and that the Bankruptcy Court's findings cannot be

given preclusive effect.

As noted *supra*, on September 8, 2000, the Bankruptcy Court determined:

1) Leasure had received payment on $245,950.00 worth of accounts receivable
("AR"), and did not inform Coleman and/or pass the money to Coleman prior to the
execution of the contract; 2) Leasure had inflated the value of AR in an amount of
$43,937.72, by including duplicate listings; 3) Leasure had inflated the value of AR
in an amount of $83,876.14; 4) in certifying the value of his accounts payable
("AP"), Leasure failed to mention a promissory note payable to First United Bank
in the amount of $59,000.00; 5) in certifying the value of its AP, Leasure failed to
disclose that one of his corporations had signed a guarantee of Leasure's personal
debt in the amount of $1,075,000.00; and 6) the Court found that Leasure's conduct
amounted to bad faith in regards to his business affairs and his preparation and filing
of his bankruptcy petition.

The Defendants contend that because of these findings as well as the doctrine of *res judicata*, in

particular issue preclusion (collateral estoppel), they are entitled to summary judgment on the

issue of whether Leasure misstated his assets and liabilities in conjunction with the sale of his

businesses.

The Sixth Circuit Court of Appeals, in *Pratt v. Ventas, Inc.*, held that when a plaintiff

does not appeal a bankruptcy court decision to the district court, the judgment of the bankruptcy

court is final for *res judicata* purposes, and therefore, is given preclusive effect in subsequent

suits. *Pratt v. Ventas, Inc.*, 365 F.3d 514, 521-22 (6th Cir. 2004); *see also Fortier v. IRS*, 161

Fed. Appx. 514, 516-17 (6th Cir. 2005)(holding that a bankruptcy order was a final order, and

therefore, must be given *res judicata* effect).

Here, the Bankruptcy Court made its findings of fact and conclusions of law on

September 8, 2000.  When the Bankruptcy Court issued its decision, the Court sustained

26

Coleman's motion for relief from automatic stay so that the Christian County Circuit Court could enter final judgment adjudicating all other pending claims by Coleman against Leasure. However, the record shows that Leasure did not appeal this decision.  Therefore, for *res judicata* purposes, the judgment of the Bankruptcy Court is a final judgment. *See Pratt* at 521-22.

The Court also finds that the remaining elements of *res judicata*, specifically issue preclusion, are satisfied because the issues regarding Leasure's financial records are the same in both instances, and the issues were necessary and essential to the judgment of the Bankruptcy Court. *See supra*, pgs. 21-23; *see also Fortier* at 517; *Beaty*, 245 F.3d at 624.  In addition, the Court also finds that Leasure's arguments concerning the doctrine of unclean hands are also without merit in regards to the Bankruptcy Court findings, as the Defendants properly asserted a collateral estoppel argument regarding those claims.  Accordingly, the Plaintiff is precluded from re-litigating issues addressed by the Bankruptcy Court because of the doctrine of collateral estoppel.[7]

### 5. Judicial Admissions by Leasure in the State Court Proceedings

The Defendants argue that Leasure has made several judicial admissions during the state court proceedings in Christian County Circuit Court, through his testimony and through the argument of counsel, and therefore, the Defendants are entitled to judgment as a matter of law on

---

[7]The Court also notes that in this section of his response, the Plaintiff addressed the doctrine of *in pari delicto*, which is "the principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Black's Law Dictionary, 2d. Pocket Edition (West Group 2001); *see also Pinter v. Dahl*, 486 U.S. 622, 634 (1988)(The Court also notes that "delícto" is the correct spelling, not "delecto").  The Defendants acknowledge that they may raise this issue at trial, but at this juncture, they have not addressed this issue in their motion for summary judgment, and therefore, the Court should disregard the matter.  The Court agrees that this issue does not need to be addressed at this time, as it has not been raised by the Defendants.  Nonetheless, the Plaintiff asserts that the *in pari delicto* defense is not available in RICO cases.  However, most recently, other jurisdictions have determined that the defense is consistent with RICO. *See Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1155-56 (11th Cir. 2006); *Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 2006 WL 3305122, *3 (S.D. Ind. 2006).

those issues.  In particular, the Defendants argue that Leasure made binding judicial admissions concerning his misstatement of assets to Coleman including 1) $12,198.00 in a Vanliner Insurance escrow account and 2) $195,474.07 in misstated accounts receivable.  In his response, Leasure has not addressed these points.

The Sixth Circuit Court of Appeals, in *Ferguson v. Neighborhood Housing Services of Cleveland, Inc.*, stated that "[j]udicial admissions 'eliminate the need for evidence on the subject matter of the admission,' as admitted facts are no longer at issue." *Ferguson v. Neighborhood Housing Services of Cleveland, Inc.*, 780 F.2d 549, 550-51 (6th Cir. 1986)(quoting *Seven-Up Bottling Co. v. Seven-Up Co.*, 420 F.Supp. 1246, 1251 (E.D.Mo.1976), aff'd, 561 F.2d 1275 (8th Cir.1977)).  "Once made, the subject matter of the admission should not be reopened in the absence of a showing of exceptional circumstances." *Id.* at 551.  "A judicial admission is generally treated as binding. *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir.1963). Judicial admissions dispense with the need to offer proof on facts 'about which there is no real dispute.' *Id.*" *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383 (6th Cir. 2007).

"Statements become judicial admissions only when they are 'deliberate, clear and unambiguous.'" *Greenwell v. Boatwright*, 184 F.3d 492, 498 (6th Cir. 1999)(quoting *MacDonald v. General Motors Corp.*, 110 F.3d 337, 340 (6th Cir.1997)).  An attorney's statement may also qualify as a judicial admission, if it is also deliberate, clear and unambiguous. *MacDonald*, 110 F.3d at 340.  Courts are reluctant to treat statements that deal with legal conclusions as binding judicial admissions, as judicial admissions typically deal with factual matters. *Id.* at 341; *Roger Miller Music, Inc.*, 477 F.3d 383 (page numbers omitted).

28

In *MacDonald*, the Court determined that the statements by an attorney during the prior proceeding were not judicial admissions because in his statements the attorney used words such as "probably" and "suggesting," which the Court held made the statements "ambiguous," and therefore, not judicial admissions. *MacDonald* at 340.  In addition, the Court supported its holding by determining that the statements made were opinions and legal conclusions that did not relate to factual matters, and therefore, did not qualify as judicial admissions. *Id.*

In the instant matter, the first of the two (2) statements, which deals with the Vanliner Insurance account, involves the statements of Plaintiff's counsel, Mr. Gregory Goonan ("Mr. Goonan"), during the state court proceeding.  This statement does not contain any ambiguous language.  However, the comment does contain legal conclusions.  Concerning the Vanliner Insurance statements, Mr. Goonan stated:

> Now, Valiner, you won't hear any dispute from me...[t]here's no dispute that Mr. Leasure told Coleman that the Vanliner account, that he believed Coleman would be able to get - and there's no dispute when the time came to get the money Coleman wasn't able to get it.  Was that a breach of contract?  It was...I can't believably stand up here and tell you that there was not a breach of contract because it was...[s]o as you go to the jury room and look this Vanliner...you should check yes...[a]nd you should put the dollar amount damage that they're asking for, twelve thousand one hundred ninety-eight dollars.

Collectively, this statement contains both factual and legal statements.  The part of the statement by Mr. Goonan that addresses how Coleman was unable to get the money from the Vanliner account qualifies as a judicial admission because it is a factual statement.  However, the part of the statement that address the breach of contract directly is a legal conclusions, which does not qualify as a judicial admission, because courts within the Sixth Circuit are hesitant to recognize legal conclusions as judicial admissions. *See Roger Miller Music, Inc.*, 477 F.3d 383 (page number omitted).  Nonetheless, despite the legal conclusions contained within the statement, the

29

factual statements by Mr. Goonan that express how Leasure did not pay Coleman is enough to qualify as a judicial admission because it dispenses the need to offer further facts on the insurance account. *See Ferguson* at 550-51.  Therefore, the Defendants are entitled to judgment as a matter of law on that issue.

In looking at the second statement, which concerns the $195,474.07 misstated in accounts receivable, Mr. Goonan stated:

> On the prepaid accounts receivable...Coleman goes out an hires, as I said before, this excellent accountant.  He spends hundreds of hours coming up with a number as to what they believe the prepaid accounts receivable.  We look over their work and say, "[y]ou're right.  Lacy, you're the good man.  You do work good work."  We agree with his analysis...Coleman hasn't proved that they're entitled to any money over and above what Mr. Lacy said.  We've already conceded that.  So when you go to the jury room and you look at these questions about the prepaid accounts receivable, I would suggest to you, unless you somehow think Doug Coleman is more knowledgeable about this than English Lacy, their own accountant, you should check no.  They've gotten what they're entitled to on that, the hundred and ninety-five thousand dollar number.

The Defendants contend that the statement constitutes a judicial admission by Leasure that he misstated the amount of accounts receivable by $195,474.07, as entered as a directed verdict by the state court.

The language used by Mr. Goonan in the second statement describing the AR is unambiguous and deliberate.  While his comments do not directly state that Leasure intentionally misstated the amount of accounts receivable, it does directly acknowledge that the figure Mr. Lacy came up with, $195,474.07, was how much the AR were misstated.  As such, this statements constitutes a judicial admission by Leasure that his accounts receivable were

misstated.  Accordingly, the Defendants are entitled to judgment as a matter of law on this issue.[8]

### 6. A Pattern of Racketeering Activity under Section 1962(c) of RICO

Section 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In order to prove a violation of RICO, Section 1962(c), a Plaintiff must show: "1) that there were two or more predicate offenses; 2) that an "enterprise" existed; 3) that there was a nexus between the pattern of racketeering activity and the enterprise; and 4) that an injury to business or property occurred as a result of the above three factors." *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000).  "In addition, the Supreme Court has held that in order to be held responsible under [part (c) of] the Act, a defendant must have not only participated in the scheme, but must have also participated in the operation or management of the enterprise itself. *See Reves v. Ernst & Young*, 507 U.S. 170, 183, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)." *Id.* "The alleged predicate acts may consist of offenses 'which are indictable' under any of a number of federal statutes, including the mail (18 U.S.C. § 1341) and wire fraud statutes (18 U.S.C. § 1343). 18 U.S.C. § 1961(1)." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir. 2006).  Additionally, the nexus requirement under Section 1962(c) mandates the plaintiff to articulate in what manner each of the Defendants' activities furthered the alleged racketeering scheme. *Whaley v. Auto Club Ins. Ass'n*, 129 F.3d 1266, *3 (6th Cir. 1997).  Lastly, the plaintiff

---

[8]The Court also notes that by failing to properly address the issue of judicial admissions in his response, Leasure failed to meet his burden under FRCP 56.  For that additional reason, the Defendants are also entitled to judgment as a matter of law concerning the judicial admissions by Leasure. *Clark v. City of Dublin, Ohio*, 178 Fed. Appx. 522, 524-25 (6th Cir. 2006).

must allege some evidence demonstrating a "chain of command" or "hierarchy" in order to show that the enterprise functioned as a "continuous unit." *VanDenBroeck* at 700 (citing *U.S. v. Turkette*, 452 U.S. 576, 583 (1981)).

The Defendants contend that the Plaintiff cannot prove a pattern of racketeering activity because he cannot demonstrate that his allegations are sufficiently related to constitute a pattern for RICO purposes.  In addition, the Defendants argue that the Plaintiff cannot satisfy the continuity requirement in order to establish a pattern, and that the Plaintiff cannot meet this burden because he has not been injured in his individual capacity.  The Plaintiff responds by asserting that he has suffered a direct injury due to the actions of the Defendants.

The Sixth Circuit Court of Appeals, in quoting the United States Supreme Court in *Moon*, explained that there are two (2) ways "a RICO plaintiff may prove (or, as is the case here, allege) a 'pattern of racketeering activity' by showing open-ended continuity. First, '[a] RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit.'  Alternatively, 'the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.'" *Moon*, 465 F.3d at 729 (quoting *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)).

To satisfy the "relatedness" requirement of Section 1962, a plaintiff must properly allege that the "predicate acts [] have 'the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id.* at 724. (quoting *H.J., Inc.*, 492 U.S. at 240).  Here, the Plaintiff has satisfied the relatedness requirement through its pleadings because he has sufficiently alleged

that the Defendants used mail and wire fraud to carry out their scheme against the Plaintiff and others.

However, in the instant matter, similar to *Moon*, the Defendants also challenge the relationship between the predicate acts and the threat of continuing activity.  As noted by the Supreme Court in *H.J. Inc.*, "'the term pattern itself requires the showing of a relationship between the predicates and of the threat of continuing activity.  It is this factor of continuity plus relationship which combines to produce a pattern.'" *Moon* at 724 (quoting *H.J. Inc.* at 239). "'Continuity and relationship constitute two analytically distinct prongs of the pattern requirement.'" *Id.* (quoting *Vild v. Visconsi*, 956 F.2d 560, 566 (6th Cir.1992)).

"Whether a pattern of racketeering activity satisfies the continuity requirement depends on the particular facts of each case." *Id.*  "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (citing *H.J. Inc.* at 241).  "A closed period of continuity may be demonstrated 'by proving a series of related predicates extending over a substantial period of time.'" *Id.* at 725 (quoting *H.J. Inc.* at 242).  "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *H.J. Inc.* at 242.  "[O]pen-ended continuity could be pleaded through facts showing 'a distinct threat of long-term racketeering activity,' or by showing 'that the predicate acts or offenses are part of an ongoing entity's regular way of doing business.' *H.J. Inc.*, 492 U.S. at 242." *Id.* at 727.  "A[n] [open-ended] RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *H.J. Inc.* at 242.

33

In *Moon*, the Court held that the plaintiff did not properly set out or demonstrate either a closed period of continuity or an open period of continuity. *Id.* at 724-26.  The Court held that the plaintiff did not satisfy the closed period of continuity because the related predicate acts did not extend over a substantial period of time, but only a nine (9) month period. *Id.* at 724-25.  In addition, the Court found that the plaintiff did not meet the requirements of establishing open-ended continuity because the Court determined there was no risk of ongoing racketeering activity or that the defendants regularly conducted business in the manner suggested by the plaintiff. *Id.* at 726-27.  The Court emphasized that it reached its determinations based on a "fact-specific continuity inquiry," finding that the plaintiff's arguments did not meet the continuity requirement in order to establish a pattern of racketeering activity because the plaintiff failed to demonstrate a long term threat and that the defendants regularly conducted business in the manner alleged by the plaintiff. *Id.* at 727.

In the instant matter, similar to *Moon*, the Court finds that the Plaintiff has not met the continuity requirement to establish a pattern of racketeering activity.  The facts alleged by the Plaintiff in his complaint and the evidence brought out during discovery does not demonstrate a pattern of a closed or open-ended period of continuity.

In looking at the closed period of continuity, the Plaintiff alleges that the Defendants schemed to take over his business by purchasing it then suing him in state court.  However, the Plaintiff first met and approached the Defendants about the purchase in late 1998, and the state court action was filed about nine (9) months later in August 1999.  Similar to *Moon*, nine (9) months does not establish the requisite continuity because it is not "substantial" under RICO. *See Moon* at 724-25.  Therefore, the Plaintiff cannot prove a closed period of continuity.

34

In looking at the open-ended period of continuity, the Court finds that there is no risk, threat or potential, either explicitly or implicitly, for the alleged acts of the Defendants to continue in the future.  Here, the allegations of this particular matter contend that the Defendants' did not inform the Plaintiff that his AR were overstated and that the Defendants did not inform the Plaintiff of this because they wanted to sue him in state court in order to add his business to their alleged RICO enterprise.  As such, the Plaintiff's argument relies on the contention that the Defendants needed him to have inaccurate financial records in order to successfully complete their RICO scheme to takeover his businesses.  There is no evidence to suggest that the Defendants seek out companies with inaccurate financial records so that they may purchase their businesses then take them to court to recover more money.  In addition, the Plaintiff has put forth no evidence to suggest that engaging in this particular type of activity is Defendants' regular way of doing business.  Therefore, the Plaintiff cannot prove an open-ended period of continuity.

Accordingly, the Plaintiff cannot prove a pattern of racketeering because Leasure cannot meet the continuity requirement of RICO, Section 1962(c).

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is **GRANTED**.  All claims against the Defendants are **DISMISSED**.

An appropriate order shall issue.